IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL PLASTICS &<br>EQUIPMENT CORP.,<br><br>    Plaintiff,<br><br>  v.<br><br>HPM, A TAYLOR'S COMPANY,<br>TAYLOR'S INDUSTRIAL SERVICES,<br>LLC, and SANDRETTO USA, INC.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 07-1053<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM

I

In this diversity action, Plaintiff, International Plastics
& Equipment Corporation ("IPEC"), asserts claims against
Defendants, HPM, a Taylor's Company ("HPM"), Taylor's Industrial
Services, LLC ("Taylor's Industrial Services") and Sandretto USA,
Inc. ("Sandretto USA") (collectively, "Defendants"), for breach
of contract (Count I), breach of warranty (Count II) and
misrepresentation (Count III). In addition, Sandretto USA has
filed a counterclaim against IPEC to recover payment for goods
sold and delivered. Pursuant to Fed.R.Civ.P. 56, Defendants have
filed a motion for summary judgment seeking judgment in their
favor as a matter of law on IPEC's claims and Sandretto USA's
counterclaim. For the reasons set forth below, Defendants'
motion will be granted in part and denied in part.

1

For purposes of the present motion, the following facts are undisputed:

IPEC is a Pennsylvania corporation with its principal place of business located in New Castle, Pennsylvania.[1] (Complaint, ¶ 1). IPEC is a manufacturer of tamper-evident dairy, water, juice and custom-designed plastic bottle caps. To manufacture the plastic bottle caps, IPEC usēs presses, also known as injection molding machines.[2] (Complaint, ¶ 6, Pl's Counter-Statement and Response, p. 1, ¶¶ 1-2, Dfs' Reply, ¶¶ 1-2).

Sandretto USA, an Ohio corporation with its principal place of business located in Mount Gilead, Ohio, manufactures the types of presses utilized by IPEC to manufacture its plastic bottle caps. Between March 31, 1996 and April 1, 2002, IPEC purchased eighteen "Series 8" presses from Sandretto USA at a price of approximately $150,000 per press. In 1998, IPEC started to experience a problem with a critical component part of the Series 8 presses purchased from Sandretto USA. Specifically, the screw motors which run the presses failed after approximately eighteen months of use. The failure of the screw motors after such a

---

[1] IPEC has production facilities in New Castle, Pennsylvania and Brewton, Alabama, as well as a distribution center in Henderson, Nevada. (Dfs' Appendix, Exh. B, p. 14).

[2] Raw material is injected into the presses which mold the raw material into bottle caps. (Dfs' Concise Statement, ¶ 10, Pl's Counter-Statement and Response, p. 8, ¶ 10).

2

short period of time is considered a defect.[3]  (Pl's Appendix,
Exh. N, Dfs' Concise Statement, ¶¶ 8 and 11, Pl's Counter-
Statement and Response, p. 2, ¶¶ 3-6, p. 8, ¶¶ 8 and 11, Dfs'
Reply, ¶¶ 3-6).

Initially, Sandretto USA told IPEC that the failure of the
Series 8 screw motors was just "an anomaly."  (Pl's Counter-
Statement and Response, p. 2, ¶ 7, Dfs' Reply, ¶ 7).  The problem
persisted into 1999, however, and IPEC alleges that an oral, two-
part agreement was reached with Sandretto USA.  First, IPEC
claims that Sandretto USA promised to develop a new screw motor
for the Series 8 presses which would not fail after eighteen
months.  Second, IPEC claims that Sandretto USA promised to
provide replacement screw motors to IPEC at no cost until a new
screw motor was developed.  (Pl's Counter-Statement and Response,
p. 2, ¶¶ 8-10).  IPEC further alleges that IPEC and Sandretto USA
operated under this agreement for years; that between 1999 and
2005, Sandretto USA provided 5 to 15 replacement screw motors per

---

[3]With regard to the existence of a defect in the screw
motors of the Series 8 presses, during his deposition on April 1,
2008, Christopher Filos, the current President and Chief
Executive Officer of Sandretto USA, was asked whether he denied
that a defect existed, and he responded "No."  (Pl's Appendix,
Exh. B, p. 103).  However, in the response to IPEC's request for
production of documents which was served on IPEC on March 14,
2008, Defendants denied that the screw motors at issue were
defective.  (Pl's Appendix, Exh. P, p. 2).  Despite this obvious
inconsistency in Defendants' position, for purposes of the
present motion, the Court will deem the fact that the Series 8
screw motors were defective as undisputed.

3

year to IPEC at no cost; and that throughout this time period, Sandretto USA represented that it was working on a new, commercially viable screw motor for the Series 8 presses to permanently solve the problem of premature failure. (Pl's Counter-Statement and Response, p. 3, ¶¶ 13-15).

An invoice from Sandretto USA dated July 25, 2003 supports the agreement alleged by IPEC regarding free replacement screw motors. Specifically, the invoice shows that IPEC ordered two replacement screw motors from Sandretto USA that day. In the section of the invoice for entry of the Customer Purchase Order Number, the word "WARRANTY" is typed, and the invoice indicates that IPEC was not charged for these replacement screw motors. The invoice also indicates that IPEC received the order on July 29, 2003. (Pl's Appendix, Exh. O).

A letter from Gerald Singer, an employee of Sandretto USA, to Jay Martin, IPEC's Vice President of Operations, on October 18, 2004, also supports the agreement alleged by IPEC concerning free replacement screw motors. The letter states in relevant part:

\* \* \*

"In order to prevent such delays from affecting IPEC's production schedule in the future I have instructed Scott Biddle to do the following without delay:

\* \* \*

2. Order four more [Series 8] screw motors, drop ship two of each to Brewton and New Castle. **Two of these**

4

**four represent warranty with no cost to IPEC. This fulfills the extended warranty agreement.** The other two represent [Sandretto USA] stock consigned to IPEC **until such a time that the screw motor rebuild kits we discussed become available (in Process).** (emphasis added).

All we ask of the consignment stock is that IPEC agree to drop ship it to another Sandretto customer in need upon request, shipping pre-paid...."[4]

\* \* \*

(Dfs' Appendix, Exh. C, p. 2, Pl's Appendix, Exh. E).

HPM is a division of Taylor's Industrial Services, an Illinois corporation. In early 2005, Taylor's Industrial Services and its President and Chief Executive Officer, Christopher Filos, purchased Sandretto USA in a stock transaction. Taylor's Industrial Services is the majority shareholder of Sandretto USA, while Mr. Filos is the minority shareholder.[5] (Dfs' Concise Statement, ¶ 2, Pl's Counter-Statement and Response, p. 3, ¶¶ 16-18, p. 7, ¶ 2, Dfs' Reply, ¶¶ 16-18, Dfs' Appendix, Exh. A, pp. 26-27).

In February 2005, shortly after his purchase of Sandretto USA, Mr. Filos met with representatives of IPEC, including Joseph

---

[4]With respect to Sandretto USA's agreement to stock two Series 8 screw motors at IPEC's production facilities, Shawn Fabry, IPEC's Chief Financial Officer, testified during his deposition that Sandretto USA agreed to this arrangement to minimize the production down time suffered by IPEC when a Series 8 screw motor failed prematurely. (Pl's Appendix, Exh. A, p. 45).

[5]As noted in footnote 3, Mr. Filos also is the President and Chief Executive Officer of Sandretto USA.

Giordano, IPEC's Chief Executive Officer, Jay Martin, IPEC's Vice President of Operations, and Joe Sizer, the Plant Manager of IPEC's New Castle facility. Among the matters discussed during this initial meeting were the defective screw motors in the Series 8 presses and Sandretto USA's promise to provide free replacement screw motors pending its development of a new, commercially viable screw motor. IPEC claims that during this meeting, Mr. Filos promised to continue to honor the agreement which IPEC and Sandretto USA had been working under for years regarding free replacement screw motors. Defendants, on the other hand, deny that such a promise was made by Mr. Filos. (Pl's Counter-Statement and Response, p. 4, ¶ 19, Dfs' Reply, ¶ 19, Pl's Appendix, Exh. A, pp. 37, 40-41).

On April 18, 2005, Mr. Martin sent a memo to Harry Wowchuck, Defendants' Vice President of Injection Molding, concerning Mr. Wowchuck's recent visit to one of IPEC's facilities on behalf of Sandretto USA. In his memo, Mr. Martin summarized the issues that had been discussed or may need to be discussed further in the future, including the following issues: "1) Stocking of 2 screw motors per facility as agreed previously w/Sandretto (pre-HPM). Evaluate the new screw motors from outside source and supply one to begin testing in house if possible." (Pl's Appendix, Exh. B, p. 72, Exh. F).

6

On July 13, 2005, IPEC ordered two replacement screw motors for its Series 8 presses from Sandretto USA pursuant to Purchase Order Number 3503. This order was IPEC's first order for replacement screw motors following Sandretto USA's acquisition by Taylor's Industrial Services and Mr. Filos, and the Purchase Order indicates that IPEC did not expect to be charged for the replacement screw motors. (Dfs' Appendix, Exh. B to Exh. B).

On August 5, 2005, Mr. Martin sent an email to Mr. Wowchuck, stating in relevant part:

\* \* \*

"When you get the time next week, please give Joe Sizer or myself a call in regard to our screw motor situation. We needed two replaced out and when we called for the replacements we were told that we would be charged $18K per motor w/50% due up front. We agreed in order to expedite the process and assumed that this was probably normal protocol. We have sat together several times and discussed the ongoing issues with the screw motors that were inherited with the purchase of Sandretto and Taylor's had agreed that they would take accountability for the screw motor problem as Sandretto did. If possible, please let us know how you would like IPEC to address this when needing to reorder screw motors. We don't want to cause any confusion for either party. We appreciate your cooperation and look forward to working with you in the future. Please don't hesitate to call me over the weekend if you would like to discuss prior to next week...."

\* \* \*

(Pl's Appendix, Exh. G).

On August 9, 2005, Sandretto USA shipped the replacement screw motors for the Series 8 presses ordered by IPEC on July 13, 2005 pursuant to Purchase Order Number 3503. The invoice issued

7

in connection with the shipment indicates that the unit price for each screw motor was $18,640 for a total of $37,280, and that a 30% down payment, or $11,184, had been made by IPEC on the order. (Dfs' Appendix, Attachment to Exh. B, Dfs' Concise Statement, ¶¶ 13, 18-19, Pl's Counter-Statement and Response, p. 8-9, ¶¶ 13, 18-19). IPEC maintains that its agreement to make a down payment on Purchase Order Number 3503 was based solely on Defendants' refusal to ship the replacement screw motors without a down payment. IPEC further maintains that it "fully expected" its longstanding agreement with Sandretto USA regarding free replacement screw motors pending development of a new, commercially viable screw motor to "be honored and that it would be issued a credit for any payment made on the motors." (Pl's Counter-Statement and Response, p. 9, ¶ 19).

On August 15, 2005, Joe Sizer sent an email to Theresa Payne of Taylor's Industrial Services and Sandretto USA, requesting "a detailed description of how Sandretto would like IPEC to proceed with ordering screw motors." In her responding email, Ms. Payne states:

> Joe:
>
> I talked to Dan Cross last week; basically what I explained to him was that we need you to begin the warranty process with us as Taylor's HPM - Sandretto. I have asked that your company place a purchase order with us for a reduced price of $11,000.00 each[.] [O]n the arrival of your [purchase order] you would be issued an RMA for the old motors to come back to our facility[.] **[T]hey would at that time be evaluated for warranty and then credited to your account.**

**Any warranty items such as these have to be tracked via [purchase order] number and RMA**.... (emphasis added).

(Pl's Appendix, Exh. H).

Following a meeting on February 14, 2006, Mr. Martin sent an email to Mr. Filos, stating in relevant part:

Chris,

Thank you for coming out with John this morning.  We know how busy you are and appreciate your time.  We are optimistic that things will improve in the immediate future and we look forward to where the two of our companies can go together.  Below is the list of items that IPEC is requesting.

1)   3 Screw Motors
     a. 1 ASAP to Brewton (John called on this while leaving IPEC today)
     b. 1 to [New Castle] and 1 to Brewton

2)   Suction Filter - Sent out on Monday to Brewton

3)   Clamp parts
     a. 1 Kit for [New Castle] ASAP
     b. 2 Kits for Brewton ASAP
     c. 15 Kits over the next 6 months

4)   New Beta Design Screw Motor - New design for IPEC Series 8 machine should be available for US testing by the end of March (6 weeks).

                    *    *    *

(Pl's Appendix, Exh. I).

On August 25, 2006, Mr. Martin sent an email to Mr. Giordano regarding a "Sandretto/HPM update."[6]  In the email, Mr. Martin noted the various ways that Sandretto USA failed to satisfy

---

[6]Mr. Martin attached his February 14, 2006 email to Mr. Filos to this email to Mr. Giordano.

9

IPEC's requests during the February 14, 2006 meeting, which are set forth above. Specifically, of the four listed items, Mr. Martin reported that IPEC had received one screw motor at its Brewton facility and one screw motor at its New Castle facility, and that IPEC had received the suction filter for its Brewton facility in June, noting that it had been ordered in December 2005. In addition, Mr. Martin reported that IPEC had been requesting service on one of Sandretto USA's newer presses for two months. Mr. Martin concluded his email as follows:

\*   \*   \*

Joe, I know that you have stressed that we do everything we can to work through the 'transition' period that Sandretto is going through. I assure you that everyone genuinely wanted to see it work and have continued to try. However, as we discussed when ordering our first couple new machines, we have not seen Sandretto live up to the statements that we have heard in our meetings. As you know, we pride ourselves on being a low maintenance customer that needs very little outside help and attention from our suppliers, however, we need parts support, and for the seldom times that we need service support, it is critical that we get it, since we wouldn't ask for assistance unless it was absolutely necessary.

I wish I had better news for you since the last time we discussed the situation. I know that you personally wanted to be in the loop of how this is moving forward, and we have not seen any improvement since the last time that you and I got together for an update....

\*   \*   \*

(Pl's Appendix, Exh. K).

On August 30, 2006, Mr. Martin sent a lengthy memo to Mr. Giordano in response to Mr. Giordano's inquiry about unpaid

10

Sandretto USA invoices. In the memo, Mr. Martin again expressed dissatisfaction with the parts and service, or lack thereof, being provided by Sandretto USA. With respect to the defective screw motors in Sandretto USA's Series 8 presses, Mr. Martin stated:

> "... We were told that the new design screw motor would be in by March. We have not seen or heard a thing about one. I don't see how we could have been more accommodating. It seems that we are working harder to help them then (sic) they are. It is as if they are the customer, and we are the supplier. The cost associated with our downtime, lost production, and enormous maintenance labor over the years, including 2006 has been huge. We have lost hundreds of thousands of dollars and have never once gone back to Sandretto to take responsibility for their problems."

(Pl's Appendix, Exh. J).

Because Mr. Giordano was out of town when he received Mr. Martin's email, Mr. Giordano asked his executive assistant, Diane Wherry, to forward the email to Mr. Filos. Mr. Filos promptly responded with the following email to Ms. Wherry with a copy to Mr. Giordano:

> Subject: RE: Sandretto invoices
>
> I have read the e-mail but nothing in there states when we will get paid. Jay obviously took this as an opportunity to bash my company but it still remains the same story that you are complaining about service and parts but don't want to pay for it. And yes things may have slipped through the cracks but what would have happen (sic) if we sent you more parts. You may be mad at me for what I am saying but nothing in this e-mail address (sic) what our conversations have been about.
>
> Chris

(Pl's Appendix, Exh. J).

A week later, on September 6, 2006, Mr. Martin sent an email

to Mr. Giordano concerning IPEC's "open" issues with "Sandretto/

HPM." Among the issues was IPEC's need for the new design screw

motors for the Series 8 presses. Promptly after his receipt of

Mr. Martin's email, Mr. Giordano attached the email to an email

to Mr. Filos, requesting Mr. Filos to review the email and

contact him to discuss it. (Pl's Appendix, Exh. K). In October

2006, IPEC undertook efforts to develop its own commercially

viable screw motor for Sandretto USA's Series 8 presses. (Dfs'

Concise Statement, ¶ 22, Pl's Counter-Statement and Response, p.

10, ¶ 22).

On November 1, 2006, Shawn C. Fabry, IPEC's Chief Financial

Officer, sent a letter to Edward Finley of Taylor's Industrial

Services/HPM Division, which states in relevant part:

Dear Mr. Finley:

Mr. Giordano has informed me of his recent conversation
with Mr. Filos and HPM's request to have payment made on
your account. While Mr. Giordano has instructed me to make
payment to you as promptly as possible, he also feels it is
appropriate that we set forth in a written context our
current understanding of our business relationship. We hope
that the items in this memorandum can be resolved quickly
and that the business relationship between HPM and IPEC will
start to head again in a positive direction. I have
outlined the matters of discussion below and would
appreciate a prompt written response to them from your
organization.

Defective Screw Motor Warranty

Under IPEC's arrangement with legacy Sandretto USA Inc.
and as reaffirmed in a conversation between yourself and
Messrs. Giordano, Long and Martin in February 2005, the

12

Series 8 presses we procured had been shipped with
admittedly defective screw motors. We had been informed on
many occasions that a beta design is being completed that
will remedy the situation. Until such model is commercially
available, we have been working under the arrangement that
IPEC would receive a new defective screw motor for every old
defective one returned to your facility. Once the new
design was completed and tested, the warranty would expire
and IPEC would then bear full financial responsibility for
subsequent replacement screw motors. Accordingly, we fully
expect this agreement which we have been working under for
years to continue until the new screw motor is commercially
available and again request a formal response from you on
the timeline for such beta project completion.

Notwithstanding the above, Mr. Giordano has agreed to
make payment for half of the replacement defective screw
motors purchased on invoices 6205 - $37,620.23, 7514 -
$8,125.94 and 7513 - $7,883.50 for a total gross charge of
$53,629.67. Half of this balance would amount to $26,814.84
and after deducting our deposit of $11,184.00 on August 9,
2005 the net amount would be $15,630.84. In addition, we
have returned 4 defective screw motors in the second half of
2005 (for which we have sent proof of shipment previously)
that to date we have not received any credit. Therefore,
Mr. Giordano in an effort to bring finality to this matter,
would assume that three can be directly associated with the
50% reduction in list price on the invoices above and the
fourth one has a credit still due IPEC. On our PO# 5061, we
placed an order on March 20, 2006 for 2 additional screw
motors and paid the full balance or $36,000. Therefore, we
will apply the fourth returned defective screw motor to 50%
of one of those invoices or $9,000, thus making our total
check amount $6,630.84. We would also expect that another
credit of $9,000 would be forthcoming when we return our
next screw motor. Mr. Giordano proposes this resolution to
resolve the current situation with Sandretto. We ask that
the appropriate credits be issued and a final account
statement generated that shows a balance of $7,810.58
(including the outstanding $1,179.74 on invoice #14076 not
related to this memorandum). Once this adjusted account
statement is received, we will overnight you the payment.

It is important to note that IPEC does not believe that
any payment is required and actually believes that a refund
under our arrangement of approximately $47,000 is due from
HPM. We extend this good hearted payment gesture in hopes
that we can start to work together going forward to have a

13

more productive business relationship. After all, we still run 20 of your presses. To start to accomplish this goal, it is very important that you advise us promptly on how our screw motor situation will be resolved on a going forward basis.

\* \* \*

(Pl's Appendix, Exh. L).

Five days later, on November 6, 2006, Mr. Filos sent the following email to Mr. Giordano:

Joe, I am sorry not to have given this to you sooner. As you probably know first hand that the screw motor problem has been the Achilles heal (sic) for us. This is a problem that goes back almost 10 years old for these screw motors. So you can imagine how hard and hesitant I have been to put out a solution with the possibility of it blowing up on me also. I am now 18 months into fixing not only the company but the services that it provides, including parts and service. Since I first contacted you about the payment issue I have not only cleared up all open items but have also taken additional parts orders from you and have shipped them on time as promised. I also have had my sales representative go to your facility in Alabama to see if there was anything they needed. We also have increased our service department if you should need any assistance.

As for the screw motors the first one was proven out in Brazil on a customer which in my opinion has terrible maintenance and who beats up there (sic) machines (I would never tell this to them but it was a great place for us to test the reliability of our new motors). Below are the price and delivery for the new motors. We have put one of each on order to stock here in the USA. The vendor is promising to deliver in a quicker lead time then (sic) what is quoted for the first set.

\* \* \*

I have looked at the three open invoices 6205, 7513, 7514 totaling $42,445.67. The conversation that we had on the phone last week where we both agreed to stop fighting over the credits of the screw motors and I made the offer to split the screw motors in half and that I would send a credit for half and you pay the other half. I still stand

14

behind that I think where we went wrong since that is you sent motors back to us for credit which is part of what the argument is that we are not giving you credit on them. Thus the deal we made together. I hope you understand my point I most certainly do yours. I am available to discus (sic) if you think it would help. I look forward to working with you in the future.

Best regards,
Christopher A. Filos
President & CEO
Taylor's Worldwide, LLC

(Pl's Appendix, Exh. M).

On November 16, 2006, Mr. Giordano forwarded Mr. Filos's November 6, 2006 email to several IPEC employees, including Jay Martin and Joe Sizer, with the following email: "Hey Guys, When we have a chance let's talk about these NEW SCREW MOTORS?????????? THANKS JOE."[7] (Pl's Appendix, Exh. M). Unbeknownst to Mr. Filos, his representation in the November 6, 2006 email regarding a new screw motor "proven out in Brazil" was not true. He had been given erroneous information by a General Manager at Sandretto de Brazil.[8] (Pl's Appendix, Exh. B, pp. 106-110).

---

[7]As noted previously, by this time, IPEC was in the process of developing its own commercially viable screw motor for Sandretto USA's Series 8 presses.

[8]With respect to Mr. Filos's reference in his November 6, 2006 email to the testing of the new screw motor on a customer that, "in [his] opinion," has a terrible maintenance record and "beats up" its machines, Mr. Filos admitted during his deposition that he did not know the identity of the alleged customer. Rather, he was "just elaborating on" the information supplied by the General Manager of Sandretto de Brazil to be more "reactive" and "believable." (Pl's Appendix, Exh. B, p. 109).

15

On November 27, 2006, Mr. Filos sent the following email to

Mr. Giordano regarding the outstanding balance on IPEC's account

with Sandretto USA:

> Joe[:]  I sent this to you almost a month ago[.]  I don't
> understand why you wont (sic) pay.  Please understand I am
> not going to ask again.
>
> Chris

Mr. Giordano responded with the following email:

> Chris
> I have called you at least 4 or 5 times to discuss this with
> no call back[.]  [U]nderstand this[,] the total was not what
> we discussed and I wanted to talk it over with you because
> you said we would handle it.
> Joe

(Dfs' Supp. Appendix, Exh. 19 to Exh. A).

In April 2007, a screw motor developed by IPEC for Sandretto

USA's Series 8 presses went into production.  Currently, there

are five IPEC screw motors in production with no failures to

date.  (Dfs' Concise Statement, ¶ 23, Pl's Counter-Statement and

Response, p. 10, ¶ 23).

On July 20, 2007, Mr. Filos sent the following email to Mr.

Giordano regarding the outstanding balance on IPEC's account with

Sandretto USA:

> Joe, it has been a while since we last spoke about the issue
> of payment.  I truly respect you and your company but
> unfortunately we must get paid the $42,677.12[.]  [I]f you
> don't want to pay you will force me to do something that I
> have never done before and that is take a customer to court.
> I don't want to do this but because of the slow economy we
> need this money desperately.  I hope you understand and that
> I will always help you in the future if you ever need
> something.

I look forward to a positive response.

Christopher Filos

(Dfs' Supp. Appendix, Exh. 20 to Exh. A).

One week later, on July 27, 2007, IPEC commenced this civil action against Defendants.[9]

### III

A motion for summary judgment should be granted by a federal district court "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). In making this determination, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir.1994).

---

[9]IPEC's damages claim is three-fold. First, IPEC seeks a refund in the amount of $46,601 for the deposits it was required to make before Sandretto USA would agree to ship replacement screw motors after the purchase of Sandretto USA by Taylor's Industrial Services and Mr. Filos. Second, IPEC seeks to recover labor and material costs in the amount of $171,639, which are alleged to have been incurred by IPEC to develop its own commercially viable screw motor for the Series 8 presses. Third, IPEC seeks to recover lost profits in the amount of $132,896, which are alleged to be attributable to down time as a result of the defective screw motors in the Series 8 presses. (Dfs' Appendix, Attachment to Exh. B).

17

## Breach of Warranty

Turning first to Count II of the complaint, IPEC asserts a claim against Defendants for breach of the implied warranty of merchantability.[10]  Noting that it is undisputed the last Series 8 press was delivered to IPEC by Sandretto USA in April 2002 and this civil action was not filed until July 27, 2007, Defendants assert that IPEC's breach of warranty claim is barred by the statute of limitations in the Uniform Commercial Code ("UCC") which has been adopted in Pennsylvania.  Section 2725 of the UCC provides in relevant part:

---

[10]Count II, in its entirety, alleges:

\*    \*    \*

32.    The Series 8 model presses purchased by IPEC from Sandretto/HPM were sold to IPEC as fully operational and functional presses.

33.    The Series 8 model presses do not operate as designed, sold and intended because the screw motors are defective and/or non-operational.

34.    The failure of the performance of the screw motors for the Series 8 model presses renders the Series 8 model presses non-operational.

35.    Defendants' refusal to provide replacement and/or new screw motors constitutes a breach of the warranty that the product sold by it and its predecessor would be operational.

\*    \*    \*

(Complaint, p. 5).

18

## § 2725. Statute of limitations in contracts for sale

**(a) General rule.** - An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued....

**(b) Accrual of cause of action.** - A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

\*    \*    \*

13 Pa.C.S.A. § 2725(a) and (b).

In response to Defendants' motion for summary judgment on Count II based on the UCC's statute of limitations, IPEC asserts that the warranty provided by Defendants extended to future performance, and, therefore, under the exception set forth in Section 2725(b), its cause of action for breach of warranty did not accrue until 2005, at the earliest, "when Defendants refused for the first time to issue credits to IPEC for returned motors." Because this civil action was commenced in July 2007, IPEC maintains that its breach of warranty claim is not barred by the four-year statute of limitations set forth in Section 2725(a) of the UCC. (Pl's Brief in Opposition, p. 21). After consideration, the Court does not agree.

An implied warranty of merchantability is created not by contract language but by operation of law, *see* 13 Pa.C.S.A.

19

§ 2314,[11] and implied warranties, by their very nature, cannot "explicitly" extend to future performance. *See* Nationwide Ins. Co. v. General Motors Corp./Chevrolet Motor Div., 625 A.2d 1172, 1178 (Pa.1993); Antz v. GAF Materials Corp., 719 A.2d 758, 760 (Pa.Super. 1998). As a result, the exception to the UCC's general rule of a four-year statute of limitations does not apply in this case, and IPEC's claim for breach of the implied warranty of merchantability is time-barred.

## **Breach of Contract**

Characterizing Count I of IPEC's complaint as "a dispute over the sale of goods,"[12] Defendants assert that IPEC's breach of contract claim and any defense to Sandretto USA's counterclaim to recover payment for goods sold and delivered to IPEC are barred by Section 2201(a) of the UCC, which provides:

### § 2201.  **Formal requirements; statute of frauds**

**(a) General rule.** - Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a

[11]Section 2314 of the UCC provides in part:

### § 2314.  **Implied warranty; merchantability; usage of trade**

**(a) Sale by merchant.** - Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....

\*   \*   \*

[12]Defendants' Memorandum in Support, p. 1.

20

contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

\* \* \*

13 Pa.C.S.A. § 2201(a).

Specifically, Defendants assert that IPEC cannot "enforce a contract for the sale of goods, of an infinite number, at no cost ... without a writing signed by Defendants stating that Defendants agreed to supply IPEC with an infinite number of replacement screw motors (at no cost)." (Dfs' Memorandum in Support, p. 3).

After consideration, the Court finds Defendants' argument in support of summary judgment on Count I and IPEC's defenses to Sandretto USA's counterclaim unpersuasive. As noted by IPEC,[13] the UCC defines a "sale" as "the passing of title from the seller to the buyer **for a price**." *See* 13 Pa.C.S.A. § 2106(a). IPEC's breach of contract claim does not arise out of the original sales of the Series 8 presses to IPEC by Sandretto USA. Rather, IPEC's breach of contract claim is based on an alleged oral agreement by Defendants after the sales to provide **free** replacement screw motors pending their development of a commercially viable screw motor. Thus, the UCC's statute of frauds does not apply to

---

[13]Plaintiff's Brief in Opposition, p. 9.

IPEC's breach of contract claim or IPEC's defenses to Sandretto
USA's counterclaim.

## Misrepresentation

In Count III, IPEC seeks damages for misrepresentation with
respect to Mr. Filos's alleged promise after his purchase of
Sandretto USA to continue to provide free replacement screw
motors for the Series 8 presses and Defendants' alleged
representation that they were in the process of developing a new
screw motor for the Series 8 press. (Complaint, ¶¶ 40-41).
Defendants contend that they are entitled to judgment in their
favor as a matter of law on IPEC's misrepresentation claim
because "IPEC cannot prove that its reliance on a false statement
caused it harm."[14] According to Defendants, IPEC "did not suffer
any harm until it began spending money developing a new screw
motor when it believed that the representations made by
Defendants were false." (Dfs' Memorandum in Support, p. 5).

After consideration, Defendants' motion for summary judgment
on IPEC's misrepresentation claim will be denied. As noted by

---

[14]The elements of intentional misrepresentation or fraud are
(1) a representation; (2) which is material to the transaction at
hand; (3) made falsely, with knowledge of its falsity or
recklessness as to whether it is true or false; (4) with the
intent of misleading another into relying on it; (5) justifiable
reliance on the misrepresentation; and (6) the resulting injury
was proximately caused by the reliance. *See, e.g.*, Gibbs v.
Ernst, 647 A.2d 882 (Pa.1994).

22

IPEC,[15] Defendants' argument regarding Count III overlooks the
fact that the damages sought by IPEC as a result of Defendants'
alleged misrepresentations are not limited to the labor and
material costs incurred by IPEC to develop its own screw motor
for Sandretto USA's Series 8 press. Among other things, IPEC
seeks to recover the down payments it was required to make before
Sandretto USA would agree to ship replacement screw motors
following the acquisition of Sandretto USA by Taylor's Industrial
Services and Mr. Filos in early 2005. In sum, the Court agrees
with IPEC that issues of fact exist with respect to its
misrepresentation claim, precluding judgment in Defendants' favor
as a matter of law on such claim.

## Attorneys' Fees

In its complaint, IPEC's requested relief included
attorneys' fees incurred to pursue this action. (Complaint, p.
6). Defendants assert, and IPEC concedes, that under
Pennsylvania law, attorneys' fees are not recoverable in the
present case. Thus, Defendants' motion for summary judgment on
IPEC's request for attorneys' fees will be granted.

## HPM's Capacity to be Sued

Finally, Defendants assert, and IPEC concedes, that as a
mere division of Taylor's Industrial Services, HPM is not an
entity capable of being sued. Accordingly, Defendants' motion

---

[15]Plaintiff's Brief in Opposition, pp. 5-7.

23

for summary judgment with respect to IPEC's claims against HPM
will be granted, and a separate Order will be entered amending
the caption to delete HPM as a Defendant.

_William L. Standish_
William L. Standish
United States District Judge

Date: August _7_, 2008